UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| ZIMMER, INC., | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| vs. | ) CAUSE NO. 3:14-CV-312 RLM |
| | ) |
| DAVID MASTERS and | ) |
| ANDREW MASTERS, | ) |
| | ) |
| Defendants | ) |

OPINION AND ORDER

Zimmer, Inc. asks the court to enforce non-solicitation covenants executed by two of its former employees. The court granted Zimmer's motion for a temporary restraining order on February 26 and heard evidence and argument on the preliminary injunction motion on March 26 and 27. Because the covenant appears to be unreasonable under Indiana law (which provides the rule of decision in this case), Zimmer has shown itself to have, at most, a barely greater than negligible likelihood of success on the merits. Zimmer has shown the balance of risks of an erroneous ruling to favor Zimmer only slightly, if at all. Accordingly, the court denies the motion for a preliminary injunction.

Zimmer develops, manufactures, distributes, and sells orthopaedic reconstructive, trauma, extremity, biologic and surgical devices, products, processes, and services. It markets, distributes, and sells those products throughout the United States and in foreign countries. David Masters and Andrew

Masters worked together for Zimmer Southwest, Inc., which was an independent distributor of Zimmer products, from November 2003 until they began working directly for Zimmer in October 2012.

In 2012, Zimmer decided to bring its sales in the Arizona area in-house. Zimmer offered employment to David Masters and Andrew Masters. David and Andrew Masters became Zimmer employees on October 1, 2012. David Masters received a bonus of $50,000 and a $100,000 loan against his commissions. In their Zimmer Southwest years, Team Masters (David and Andrew Masters were known by this name within Zimmer) worked with surgeons, hospitals, and surgery centers from the Phoenix Valley to Tucson, and further west to Yuma, Arizona. Everyone at Zimmer, including Zimmer's regional manager Ray Richmond, generally understood that David and Andrew Masters would retain the accounts they had serviced with Zimmer Southwest. Mr. Richmond understood that the retention would last only through the transition period, but he didn't say anything to David or Andrew Masters about that limitation.

David and Andrew Masters had access to confidential, proprietary, and trade secret information about Zimmer's business. They learned about Zimmer's sales force and employees, marketing plans and strategies, pricing, profit margins and business plans, customers and active prospects, customer preferences, and other confidential customer information. Sales reps help customer surgeons during surgical procedures, providing technical support to surgeons and their

2

staff, showing Zimmer's products to surgeons, and providing surgeons with information about Zimmer's products. Sales reps are the face of Zimmer.

David and Andrew Masters each signed a non-competition/non-solicitation agreement with Zimmer that contained restrictive covenants in paragraph 7 of the agreements. Summarizing brutally, those covenants provide that for one year after leaving Zimmer, the signer can't attempt or assist selling competing products to any Zimmer customer of active prospect in the geographic area assigned to the employee within the last two years of employment with Zimmer. The agreements recited that the covenants were reasonable and necessary for protection of Zimmer's confidential information, inventions, and goodwill. Paragraph 17 of the agreements was an integration clause stating that no agreements existed apart from what was in the written agreements.

In late January 2013, Zimmer hired Mike Murphy as a sales rep in the southwest territory. Mr. Murphy was an experienced sales rep in the field and was unencumbered by a non-compete provision. Among the accounts Mr. Richmond assigned to Mr. Murphy were fourteen of the accounts that Team Masters had been servicing for Zimmer and, before that time, for Zimmer Southwest. David Masters vigorously protested the change of assignments, believing that he and Andrew had been promised that they could keep their original accounts. David Masters accused Zimmer of breaching its contract. Mr. Richmond appears to have engaged in little actual dialogue with David Masters, but he gave Team Masters responsibility for four additional surgeons, at least two of whom produced a lot of

3

business for Team Masters and Zimmer. Communication between Mr. Richmond and Team Masters about the transfer of surgeons from Team Masters to Mr. Murphy appears to have ceased after that.

Team Masters generated some $4.5 million in revenue for Zimmer in 2013.

Sometime around the beginning of 2014, two of the surgeons with whom David Masters worked told him he should try to find a better product to sell than that offered by Zimmer. Soon after that, David Masters told Zimmer he was resigning from Zimmer to become a distributor for a competitor named Medacta. David Masters told Zimmer that Andrew Masters would be joining him, but Andrew Masters never told anyone at Zimmer that he intended to leave. Andrew Masters testified at the hearing that he hadn't decided whether to leave the profitable Zimmer business behind.

David Masters's last day at Zimmer was February 7, 2014. Mr. Masters had had several conversations with Medacta in the day before that, while he still was an employee at Zimmer. Zimmer believes Mr. Masters was providing Medacta with confidential Zimmer information while he still worked for Zimmer. Zimmer might be able to prove that belief at trial, but, at this point, the evidence isn't especially compelling.

Zimmer fired Andrew Masters on February 3, believing that Andrew Masters had been trying to get customers to switch from Zimmer to Medacta. Mr. Richmond testified at the hearing that Andrew Masters's failure to reach sales targets was another ground for his termination; this explanation is puzzling

because none of the papers before the court associate any accounts with Andrew Masters alone. It's difficult to understand how Andrew Masters could have been falling behind on his targets. In any event, Andrew Masters appeared at a surgery the next day at the surgeon's invitation. When it became apparent that an item essential to the surgery was missing, Andrew Masters drove off to get the part and the surgery was completed.

Zimmer filed this suit on February 14, together with its request for a temporary restraining order. Zimmer is incorporated in, and has its principal place of business in, Indiana. David and Andrew Masters are citizens of Arizona. The court has jurisdiction under 28 U.S.C. § 1332(a). The court heard argument on that motion on February 26 and granted the motion, forbidding the defendants from anything that could give Medacta a competitive advantage in connection with twenty-five named hospitals and surgical centers "and all surgeons affiliated therewith." Zimmer then moved for a preliminary injunction, and the TRO was extended to March 26. The court heard evidence and argument on the preliminary injunction on March 25 and 26. With the parties' agreement, the court extended the TRO to April 2.

A preliminary injunction isn't to be granted unless the movant carries its burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (*quoting* 11A C. WRIGHT, A. MILLER & M. KANE, FEDERAL PRACTICE AND PROCEDURE § 2948, pp. 129-130 (2d ed. 1995)). A preliminary injunction is meant to minimize the hardship to the parties pending judgment in the case. Anderson v. U.S.F. Logistics

5

(IMC), Inc., 274 F.3d 470, 474 (7th Cir. 2001). One seeking a preliminary injunction must demonstrate a reasonable likelihood of success on the merits of its claim, a lack of an adequate remedy at law, and that irreparable harm will result if the injunction isn't granted. Lambert v. Buss, 498 F.3d 446, 451 (7th Cir. 2007). If that showing is made, the court must then consider any irreparable harm the preliminary injunction might impose upon the party against whom the injunction is sought and whether the preliminary injunction would harm or foster the public interest. Lambert v. Buss, 498 F.3d at 451. These factors are weighed on a sliding scale: as the plaintiff's chance of success on the merits increases, the less the balance of harms must weigh in its favor. Promatek Indus., Ltd. v. Equitrac Corp., 300 F.3d 808, 811 (7th Cir. 2002).

By the agreements' terms, Indiana law governs the non-compete agreements. Indiana law generally disfavors restrictive covenants in employment contracts, construes them strictly against employers, and denies enforcement if the restrictions are unreasonable. Central Indiana Podiatry, P.C. v. Krueger, 882 N.E.2d 723, 729 (Ind. 2008). The reasonableness of a non-compete agreement is a question of law. Id. The agreements signed by David and Andrew Masters each contain a covenant not to compete with Zimmer and a covenant not to solicit Zimmer customers and active prospects. Zimmer is proceeding only on the non-solicitation covenant. The same legal standards cover both types of covenants.

"A restrictive covenant must be reasonable with respect to the legitimate interests of the employer, restrictions on the employee, and the public interest."

6

MacGill v. Reid, 850 N.E.2d 926, 929 (Ind. Ct. App. 2006) (*quoting* Pathfinder Communications Corp. v. Macy, 795 N.E.2d 1103, 1109 (Ind. Ct. App. 2003)). To establish the reasonableness of its restrictive covenants, Zimmer must first show that it has a legitimate interest to be protected by the agreement and then must establish that the agreement is reasonable in scope as to the time, activity, and geographic area restricted. Central Indiana Podiatry v. Krueger, 882 N.E.2d at 729; Clark's Sales and Serv., Inc. v. Smith, No. 49A02-1306-PL-552, 2014 WL 657082, at *6 (Ind. Ct. App. Feb. 20, 2014). Zimmer must show that David and/or Andrew Masters has gained a unique competitive advantage or ability to harm the employer before Zimmer can gain the protection of a non-competition covenant. Pathfinder Communications v. Macy, 795 N.E.2d at 1109.

The parties disagree at the edges about what constitutes confidential information, but they appear to have no real dispute about the proposition that Zimmer has a legitimate protectable interest. In any event, the record before the court contains ample evidence of such a protectable interest. The Masters's advantageous personal contacts with Zimmer customers amount to protectable goodwill, Central Indiana Podiatry v. Krueger, 882 N.E.2d at 729; *see also* Clark's Sales and Serv. v. Smith, 2014 WL 657082, at *4 ("It has long been settled in Indiana courts that present customers are a protectable interest of an employer."), even to the extent David and Andrew Masters might have had such contacts with the same customers before joining Zimmer or Zimmer Southwest. David and Andrew Masters also have information about the needs and specifications of those

7

customers. Clark's Sales and Serv. v. Smith, 2014 WL 657082, at *6; Coates v. Heat Wagons, Inc., 942 N.E.2d 905, 913 (Ind. Ct. App. 2011).

The inquiry then turns to the reasonableness of the covenants Zimmer is trying to enforce. For a covenant not to compete or not to solicit to be enforceable, Indiana law requires that the covenant be reasonable in terms of time, geography, and types of activity prohibited. MacGill v. Reid, 850 N.E.2d 926, 930 (Ind. Ct. App. 2006). The Masters don't dispute, and the court holds, that the covenants' one-year prohibition is reasonable under Indiana law. *See* JAK Productions, Inc. v. Wiza, 986 F.2d 1080, 1090 (7th Cir. 1993) (agreeing with district court that one-year non-competition provision was "reasonable and enforceable under Indiana law"); Standard Register Co. v. Cleaver, 30 F. Supp. 2d 1084, 1098 (N.D. Ind. 1998) (two-year restriction found to be reasonable); Clark's Sales and Serv. v. Smith, 2014 WL 657082, at *7 (parties agreed that two-year time restriction was reasonable and valid); Coffman v. Olson & Co., P.C., 906 N.E.2d 201, 208 (Ind. Ct. App. 2009) (two-year time limitation not against public policy); Gleeson v. Preferred Sourcing, LLC, 883 N.E.2d 164, 174 (Ind. Ct. App. 2008) (finding 18-month restriction reasonable based on a recognition that "Indiana courts have upheld non-competition agreements that restrict competitive activity for two-year periods").

The reasonableness of the covenants' "geographic area" is a principal matter of dispute between Zimmer and the Masters brothers. Indiana courts have limited geographic region restrictions to the area(s) where the employee has established

relationships, specifically where the legitimate interest is to protect the employer's existing and prospective customer relationships. *Compare* Clark's Sales and Serv. v. Smith, 2014 WL 657082, at *8 (50 mile geographic restriction would be reasonable), and Gleeson v. Preferred Sourcing, 883 N.E.2d at 174 (150-mile restriction was reasonable), *with* Dicen v. New Sesco, Inc., 839 N.E.2d 684, 689 (Ind. 2005) (restriction prohibiting work in the land remediation business anywhere in the United States unreasonable), and Buffkin v. Glacier Group, 997 N.E.2d 1, 13 (Ind. Ct. App. 2013) ("anywhere in the continental United States" unreasonable). Zimmer must demonstrate that it has "a legitimate interest to be protected in the relevant markets in which it seeks to prohibit [David and Andrew Masters's] activity and that any competition presented by [David and Andrew Masters's] activities in those markets would be unfair." Buffkin v. Glacier Group, 997 N.E.2d at 13.

Evaluating the reasonableness of the geographic area of the prohibition on competition and solicitation in the Masters's employment agreements is no easy task. The prohibition appears to be limited to a geographic area. Paragraph 7(b)(2) of the agreement says:

> (b)(2) <u>Covenant Not to Solicit Customers or Active Prospects</u>. Employee will not (i) provide, sell or market; (ii) assist in the provision, selling or marketing of; or (iii) attempt to provide, sell or market any Competing Products to any of Company's Customers or Active Prospects in the Restricted Geographic Area.

9

Paragraph 7(a)(4) defines "Restricted Geographic Area" as "any geographic territory assigned to Employee during Employee's last two years of employment with Company."

David and Andrew Masters contend that this definition defeats Zimmer's right to enforce the covenant. The covenant is limited to a "Restricted Geographic Area," but the covenant defines nothing in terms of geography. Indiana case law provides only modest support for the defendants' argument. In <u>Seach v. Richards, Dieterle & Co.</u>, 439 N.E.2d 208 (Ind. Ct. App. 1982), the Indiana Court of Appeals upheld a non-compete covenant that didn't designate a specific geographic area, instead prohibiting contact with any past, present, or prospective customer of the employer. The court of appeals reasoned that this coverage was reasonable because it was as specific as any geographic limitation. Five years later, in <u>Field v. Alexander & Alexander of Indiana, Inc.</u>, 503 N.E.2d 627, 635 (Ind. Ct. App. 1987), the court of appeals considered a covenant prohibiting contact with customers with whom the employee had contact in the two years before leaving his employment. The court held that the "class is as well defined and specific as that in *Seach*, and it is similarly enforceable without geographic limitation." It can't be said that either of the covenants at issue in those cases spoke of any "geographic area," but they lend support to Zimmer's contention that Indiana law allows prohibitions limited by a class, rather than a map.

Zimmer interprets these provisions to mean that David and Andrews can't do business with any entity — surgeon, hospital, surgical center, or the like —

10

from which they received commissions during their sixteen months at Zimmer, as well as with any physicians affiliated with any of those hospitals and surgical centers.

This court agreed with Zimmer's reading of Indiana law with respect to this very covenant in Zimmer US, Inc. v. Keefer, No. 3:12-CV-395, 2012 WL 5268550, at *11 (N.D. Ind. Oct. 23, 2012). But in Keefer, the court was able to identify the assigned accounts to which the prohibition applied. Id. at *17.

In Keefer, this court evaluated whether Zimmer had made out a reasonable likelihood of success on the merits. In deciding that Zimmer had met that burden, the court might have extended Indiana law a bit. The prohibition of the covenant in the Zimmer contract is limited by a "Restricted Geographic Area," a term which itself is defined as "any geographic territory assigned to Employee during Employee's last two years of employment with Company." Unlike the agreements upheld in the Seach and Field, the Zimmer contract purports to apply a geographic limitation. No previous Indiana case held that it was reasonable for a covenant couched in terms of geography to use an extrinsic customer list. That might have been a distinction without a difference in Keefer because what was assigned to Mr. Keefer was easily determined. Indeed, it appears that the parties agreed on which accounts were assigned to Mr. Keefer. Id. The preliminary injunction in Keefer applied to nine specific points on a map rather than any defined segment of the map.

11

The "geographic territory assigned to" David or Andrew Masters is far more difficult to identify because the assignment of territories was handled much differently in Zimmer's southwest territory. As the court understands it, when a surgeon implants a Zimmer device into a patient in a hospital or surgical center, payment goes from the hospital or surgical center to Zimmer, and Zimmer pays the sales rep a share of that payment. Zimmer views "geographic territory assigned to" Team Masters as meaning any hospital or surgical center that made payments to Zimmer resulting in a commission to Team Masters. Put differently, one looks to the books at the end of the month to see what territory was assigned to a sales rep: Zimmer considers any source of income to that sales rep as a "territory assigned to" that sales rep. This seems inconsistent with any meaningful definition of the "geographic territory assigned to" a sales rep because no one at Zimmer assigned that hospital or surgical center to the sales rep; if anyone assigned it, the surgeon did so by choosing to perform the surgery at that hospital or surgical center.

Zimmer effectively has substituted the agreement's definition of "Customer" in the non-compete agreement for the concept of a "geographic territory assigned to" one or both of the defendants. Paragraph 7(a)(6) of the agreement defines "Customer" as

> any person or entity with respect to whom Company sold or provided any products and/or services at any time during the last two (2) years of Employee's employment with Company and with respect to whom, at any time during the two (2) years immediately preceding Employee's separation from Company Employee had i) any sales or

12

> service contact, business contact, or sales or service responsibilities . . . on behalf of Company, or ii) access to, or gained knowledge of, any Confidential Information concerning Company's business with such Customer.

More briefly stated, a "Customer" is an entity (A) to whom Zimmer made a sale and (B) with whom the employee had contact.

The hospitals and surgical centers that pay for the Zimmer products implanted by the surgeons seem to fall within this definition if the entity that pays for the Zimmer product is seen as having bought or received the product. Under industry practices, when Surgeon A performs surgery at Hospital X, Zimmer sells its product to Hospital X. Because the sales rep works with the surgeon in the operating room, Hospital X is an entity with whom the employee had a service contact. Because the hospital bought the product from Zimmer, the hospital — as well as the surgeon — is a "Customer."

So hospitals and surgical centers might — because they are "Customers" within the meaning of the agreement — fall within the class of people and entities David or Andrew Masters would be prohibited from contacting. But the prohibition in the agreements doesn't include all "Customers;" it includes only "Customers or Active Prospects in the Restricted Geographic Area." Zimmer's construction of that phrase effectively eliminates "in the Restricted Geographic Area."

And Zimmer asks the court to do precisely that. Zimmer says the court should use Indiana's "blue pencil" doctrine, under which courts can strike unreasonable restrictions if (but only if) they are divisible from reasonable

restrictions. Dicen v. New Sesco, Inc., 839 N.E.2d 684, 687 (Ind. 2005). Zimmer urges the court to simply "blue pencil" out the last five words in the non-solicitation covenant. Zimmer didn't make this argument until final argument at the preliminary injunction hearing, and counsel for David and Andrew Masters countered, in the defendants' final argument, that the "blue pencil" doctrine is only to be used in favor of the employee, not for the employer. Given the lateness of Zimmer's argument, the court can't fault counsel for not citing authority for that proposition, and the proposition seems reasonable with respect to a type of covenant that is strongly disfavored by Indiana courts. The court's own research, however, has disclosed nothing to support the defendants' recollection of the law, and many cases support of the contrary position. *See, e.g.,* Central Indiana Podiatry, P.C. v. Krueger, 882 N.E.2d 723, 730 (Ind. 2008) ("If a noncompetition agreement is overbroad and it is feasible to strike the unreasonable portions and leave only reasonable portions, the court may apply the blue pencil doctrine to permit enforcement of the reasonable portions.").

But "courts need not do for the employer what it should have done in the first place — write a reasonable covenant." Clark's Sales and Serv. v. Smith, 2014 WL 657082, at *11 (*quoting* Product Action Int'l, Inc. v. Mero, 277 F. Supp. 2d 919, 924 (S.D. Inc. 2003)). Courts can't use the "blue pencil" doctrine to produce a covenant that, while reasonable, wasn't what the parties intended. Blue penciling this covenant as Zimmer suggests would do precisely that. The reference to the "Restricted Geographic Area" limits the covenant's reach; whatever the

14

phrase might mean, eliminating it would produce a covenant broader than what the parties agreed to. That isn't a permissible use of the "blue pencil" doctrine. *See* Dicen v. New Sesco, Inc., 839 N.E.2d at 689 ("We decline to utilize a blue pencil to strike the geographical limitation, because the result would be no geographical limitation at all.").

David and Andrew Masters contend that the non-solicitation covenant is unenforceable for want of definition of a geographic territory. Alternatively, they say that if "accounts" is a synonym for "territory," the only accounts "assigned" to them were the forty-five surgeons and eleven institutions they had been servicing for Zimmer Southwest when they hired on with Zimmer, plus the four surgeons Mr. Richmond assigned to Team Masters after transferring about a third of those surgeons to the newly-arrived Mike Murphy. If the non-solicitation covenant is reasonable in scope, the Masters's understanding of "assigned accounts" would result in an injunction barring contact with fewer hospitals and surgical centers (the defendants' count amounts to eleven institutions, while Zimmer counts twenty-five but seeks to bar contact with only eighteen) and fewer surgeons (the Masters's calculation would amount to forty-nine surgeons; Zimmer counts forty-one but then extends to every other surgeon affiliated with those hospitals and surgical centers).

The court agrees with David and Andrew Masters that no accounts can be said to have been "assigned to" them beyond the ones the defendants have identified. But the court also agrees with David and Andrew Masters that under

15

the circumstances presented in this case and this territory, the non-solicitation covenant is unenforceable for want of the either a definite geographic area or a definite class of people and institutions the defendants can't contact. The Keefer decision might have reached the outer limits of Indiana law by defining what the agreement referred to as a "geographic area" by easily identified accounts rather than geography — substituting, when the time for enforcement, a client list for what the parties agreed would be a geographic area. Zimmer now asks the court to step across that boundary by interpreting a contract term, "geographic area," to mean "assigned accounts" with no agreement as to how an account is assigned for purposes of the non-solicitation covenant. This court has no reason to think the highest court in Indiana would extend the law in that way in light of its disfavor of covenants not to compete and its canon that such covenants are to be construed strictly against the employer. Central Indiana Podiatry, P.C. v. Krueger, 882 N.E.2d 723, 729 (Ind. 2008). Such an expansion of Indiana law must come, if at all, from the Indiana courts, rather than the federal courts. "Either a defined, geographical boundary must exist in the covenant, or a specific limited class of persons must be listed as those with whom contact is prohibited; references of one cannot be used to define the other." Commercial Bankers Life Ins. Co. of America v. Smith, 516 N.E.2d 110, 114 (Ind. Ct. App. 1987).

Arguably, analysis of the preliminary injunction motion could end at this point. The reasonableness of a covenant not to compete is a question of law, Central Indiana Podiatry v. Krueger, 882 N.E.2d at 729, so there would seem to

be no reason to await trial. And a party with no chance of prevailing on the merits can't prevail on a preliminary injunction motion. AM General Corp. v. DaimlerChrysler Corp., 311 F.3d 796, 804 (7th Cir. 2002). But when issuing the temporary restraining order five weeks ago, this court commented that Zimmer had a much greater than negligible chance of prevailing on the merits of its claim. Counsel for David and Andrew Masters had had only one day to prepare for the TRO hearing. Five weeks later, after a two-day evidentiary hearing and with a better understanding of how things work at Zimmer and how Zimmer's requested injunction lines up, things look very different. It seems unlikely that things can change again enough by trial to produce a different view of the reasonableness of the covenants in this case, but today's decision would have seemed equally unlikely five weeks ago. Accordingly, the court turns to the balance of harms.

This part of the preliminary injunction test looks to the cost error. American Hosp. Supply Corp. v. Hospital Prods. Ltd., 780 F.2d 589, 594 (7th Cir. 1986). The lower the likelihood of a party's success on the merits, the greater the balance of harms from an erroneous ruling must favor that party. Kraft Foods Group Brands LLC v. Cracker Barrel Old Country Store, Inc.,735 F.3d 735, 740 (7th Cir. 2013). Zimmer has shown that it will suffer incalculable harm without the injunction it seeks today. David and Andrew Masters have developed goodwill for Zimmer over the course of their work for Zimmer and Zimmer Southwest. MacGill v. Reid, 850 N.E.2d 926, 929 (Ind. Ct. App. 2006). Although the goodwill belongs to Zimmer, as a practical matter, David and Andrew Masters also have developed goodwill of

17

their own that they take with them from Zimmer. It can't be said with any certainty whether a given surgeon will value the quality of the Zimmer product over the quality of the services David and Andrew Zimmer provide — with two exceptions: the two surgeons who told David Masters he should get a better product aren't buying from Zimmer, even while David Masters has been restrained from selling those surgeons any other product. Those two surgeons were responsible for a large chunk of the $4.5 million Team Masters produced in 2013. In any event, Zimmer has shown that if its request for an injunction is denied erroneously, it will suffer irreparable harm.

David and Andrews Masters will suffer significant harm if the preliminary injunction is issued in error. Prohibition against contacting any of the eleven hospitals and surgical centers and forty-six surgeons that Team Masters brought to Zimmer, as well as the four other surgeons they received in their involuntary exchange with Mike Murphy, would make it very difficult for them to earn livelihoods with the knowledge and skills they have developed in their careers as orthopedic sales representatives. The injunction Zimmer seeks would, by virtue of its inclusion of every physician affiliated with every hospital and surgical center from which Team Masters received a commission, reduce their chances even more. David Masters would be unable to pay his $7,600 monthly child support obligation and his outstanding federal tax obligation of $86,000.

Zimmer would suffer irreparable harm from an erroneous ruling, but so would David and Andrew Masters. The balance of harms slightly favors Zimmer,

but since the likelihood of success on the merits is slightly better than negligible at best, the imbalance is too little to support a preliminary injunction.

For all of these reasons, the court denies Zimmer's motion for a preliminary injunction [docket # 26] and VACATES the temporary restraining order entered February 26, 2014 [docket # 19].

SO ORDERED.

ENTERED:   March 31, 2014

/s/ Robert L. Miller, Jr.
Judge, United States District Court